Graham M. Brush and Estate of Marjorie G. Brush, Deceased, Graham M. Brush, David M. Brush, Graham M. Brush, Jr., and Donald K. Brush, Executors v. Commissioner.
Brush v. Commissioner
Docket No. 79155.
United States Tax Court
T.C. Memo 1962-124; 1962 Tax Ct. Memo LEXIS 186; 21 T.C.M. (CCH) 649; T.C.M. (RIA) 62124; May 23, 1962
*186 The amount of casualty loss, deductible under section 165 of the Internal Revenue Code of 1954, sustained by the petitioner upon his residential property resulting from two storms occurring in 1955, determined. John N. Cole, Esq., for the petitioners. Gerald J. Robinson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax for the taxable year 1955 in the amount of $11,794.11. The petitioner claims an overpayment of $9,147.59. The question presented is the amount of the deductible loss occasioned by storm damage to the petitioner's residential property. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. Graham M. Brush, hereinafter referred *187 to as the petitioner is an individual residing at Warren, Connecticut, having his principal place of business in New York, New York. During the taxable year 1955 he and his wife, Marjorie G. Brush, now deceased, resided at Warren, Connecticut. They filed a joint income tax return for the taxable year 1955 with the district director of internal revenue, Lower Manhattan, New York, New York. In 1955 the petitioner owned, and resided upon, an estate of 19 1/2 acres improved with a main house, a cottage, and a tractor barn on the shore of Lake Waramaug in the town of Warren, Connecticut. A portion of the land had been purchased in 1932 at a cost of $5,500 and another portion in 1944 at a cost of $6,500. After acquiring the property in 1932 the petitioner constructed a 12-room residence upon the property, which was completed about July 1933. Prior to 1955 he had expended an amount of not less than $38,000 in constructing the house and making other improvements to the property. The property has a frontage of several hundred feet on a state highway and several hundred feet on the lake. Through the property runs a stream which empties into the lake. One road leading from the public road to *188 the residence crosses a bridge over the stream. On the night of August 18, 1955, a severe tropical storm, denominated by the United States Weather Bureau as "Hurricane Diane", struck the western portion of Connecticut, including the petitioner's property, depositing heavy rain. The stream running through the petitioner's property carried down trees, wood, other debris, and silt and deposited it at its mouth, causing the stream to overflow and flood the petitioner's property. The water rose to a depth of about three feet around the petitioner's house, which inundated the first floor to about six inches. The flood waters did not entirely recede from the first floor until August 20. The debris and silt completely filled the stream from the bridge on petitioner's property to the mouth of the stream at the lake, and the banks of the stream were raised about 2 1/2 feet. Silt was washed into the lake for a distance of 450 feet, forming a delta through which there was no channel. The flood waters destroyed the petitioner's roads and left stones on the ground of a size of from one inch to ten inches. A part of the lawn was washed away to a depth of three or four feet in places. Another *189 part was covered with two to four feet of sand, gravel, and debris, and another part was covered with three or four inches of silt. A stone terrace was undermined and destroyed. Many trees of a diameter of about 12 inches were lost and a great many more have died since the flooding as a result of being smothered. The flood waters damaged the bridge on petitioner's property and changed the character of the stream. Prior to the storm the stream was attractive in that it was bordered by trees, bushes, and ferns, had curves and pools, and at its mouth had still, deep water which provided a place for fishing and keeping a motorboat and rowboats and canoes. The storm eliminated the curves and pools, destroyed many of the bordering trees and bushes, and left the stream in a condition resembling a drainage ditch. The cellar of the house was flooded. This cellar had been designed as a concrete tank, similar to a swimming pool, and was keyed into the walls. Contained in this cellar was a 1,000 gallon water tank and various equipment, including hot water heaters, pumps, a furnace, and an artesian well. When the water level rose the cellar floated and was raised off its base, disturbing *190 the foundation of the main section of the house and destroying its alignment. The electrical equipment, the furnace and the piping were destroyed, and the chimney was cracked. The 1,000 gallon water tank broke loose and pushed up the floor of the living room. The concrete cellar itself was destroyed when the waters receded, and since it was tied into the walls, such walls cracked. The ceilings were also cracked. The oak floors in the living room, dining room, and writing room were buckled, to the extent of 2 1/2 feet in the dining room, and this pushed the walls out of line, which damaged the doors and windows. The petitioner started repairing the damage done by the storm within a few days after the storm had ceased. He supervised all the repair work. It took several days to remove the piles of material and to channel the stream away from the main house by the use of sandbags and other means. The petitioner and his sons and friends, together with workmen, forced the flood waters back into the water course, using a tractor owned by the petitioner and employing a bulldozer. The petitioner purchased materials from a company which agreed to be a general contractor on a basis that would *191 give him the benefit of reduced prices because of large quantity material buying. He reconditioned the grounds with his own equipment. It was necessary to bring in top soil and to lime, fertilize and reseed the lawns. The stone terrace was rebuilt. Most of the repairs to the house were completed by the end of 1955. The chimney was in such bad condition that it could not be used and a new chimney was built. The oak flooring and the subflooring in the living room, dining room, and writing room were replaced, as were some of the floor joists. The linoleum in the kitchen and one wing of the house was replaced. Instead of tearing down the walls and ceilings they were covered with Celotex. It was necessary to shim up the building and re-align the walls in order to make the doors and windows work. The cellar was never repaired. Instead, the petitioner moved the equipment, including the 1,000 gallon storage tank, from the cellar into a garage and installed in such garage a new furnace. A shed was added to the garage for the purpose of providing garage space. The construction of the shed cost less than it would have cost to rebuild the cellar. No salvage value was realized from the equipment *192 removed from the basement. Shortly after the flood the bridge across the stream was repaired by replacing some of the planks and the railing. As a result of the storm the angle of the stream and the level of its bed were changed and the area for water flowing under the bridge was diminished, and the petitioner concluded that there might again be serious damage either to the bridge or to the property. Accordingly, in 1958 he raised the level of the bridge about one foot to restore, to some extent, the projected area for water flowing thereunder, and also put a runaround and a subbridge on one side as a further protection against flood waters. The petitioner employed a dredging company to dredge silt out of the stream and to dredge a channel into the lake through the delta which had been deposited there. The material dredged out was deposited on a point of land at the mouth of the stream. On October 15, 1955, the day the dredging was finished, a second storm struck the petitioner's property and again deposited silt in the stream, filling it up and rebuilding the delta in the lake to about the same size as the delta caused by the first storm. This delta has never been removed. As *193 a consequence, the petitioner's property cannot be approached from the lake along about 300 feet of the lake front and a boat cannot be taken from the stream into the lake. This was the only damage done to petitioner's property by the second storm. In 1957 or 1958, when it became apparent that the stream was not going to restore itself to its former condition, the petitioner had large boulders placed in the stream bed in order to slow down the flow of water and stop further damage. In connection with all the foregoing, the petitioner expended, over the period 1955 to 1958, a total of $37,515.22 for labor, materials, and equipment, including the new furnace and the cost of the shed. The billings for work done up to October 15, 1955, were approximately $20,000. The amount of $37,515.22 includes an amount of $4,804.15 paid to a dredging company for work performed over the period from September 6 to December 2, 1955, as a result of the two storms. Of this amount, $3,762.40 was paid to the dredging company for work performed over the period from September 6 to October 15, 1955; the remainder, $1,041.75, was paid to the dredging company for work performed over the period from October 17 *194 to December 2, 1955, but the details as to the services performed are not shown. The above figure of $37,515.22 also includes an amount of $4,412.03 for work on the bridge performed in 1958. None of the damage, for which the above payments were made, was covered by insurance. The petitioner did have an insurance policy of $1,000 which covered some damages, for example, a refrigerator motor, but such items are not included in the above costs. Substantially all the pipes and plumbing and heating equipment destroyed by the 1955 flood, the replacement cost of which is included in the above expenditures, had been installed when the house was built in 1933. In 1954 petitioner's property was assessed by the town assessors of the Town of Warren, Connecticut, for local tax purposes, at a valuation of $24,490 (of which $10,066 represented the assessed valuation of the house). At that time and in 1955 the assessment for local tax purposes was 25 percent of the determined fair market value of the property. In 1955, at some time after the early part of November, the property (both house and land) was assessed at a valuation of $21,896.86. In making such assessment for 1955 the previously *195 assessed valuation of the house was decreased to $7,550 because of the storm damage. In 1957 the property (both house and land) was assessed at a valuation of $52,666. The basis for assessment in 1957 was between 50 and 60 percent of the determined fair market value of the property. The increased valuation resulted principally from an addition which the petitioner had made to the house (the cost of which, $16,950.10, is not included in the above-described expenditures). In their joint Federal income tax return for the taxable year 1955 the petitioner and his wife claimed as a deduction a casualty loss in the amount of $35,000. In the notice of deficiency the respondent disallowed $18,000 of the claimed deduction. In the petition it is claimed that the proper amount of loss was $50,000 and that there was an overpayment of tax for the year 1955 in the amount of $9,147.59. The fair market value of the petitioner's property immediately prior to the storm of August 18, 1955, was $100,000 and the fair market value thereof immediately after the storm was $65,000. The fair market value of the property immediately prior to the storm of October 15, 1955, was $85,000 and the fair market *196 value thereof immediately after the storm of October 15, 1955, was $81,300. Opinion The measure of the casualty loss deductible under section 165 of the Internal Revenue Code of 1954 is the difference between the fair market value of the property immediately preceding the casualty and the fair market value immediately thereafter, but not in excess of the basis of the property. Helvering v. Owens, 305 U.S. 468, and W. F. Harmon, 13 T.C. 373. See also section 1.165-7(b)(1) of the Income Tax Regulations.
The question of the fair market value of the petitioner's property before and after each of the two storms in 1955 is one of fact, as to which the parties are in wide disagreement. The petitioner presented as a witness Paul S. Richmond, who was engaged in the real estate and insurance business and who had had experience in valuing properties in the locality of petitioner's property. He was familiar with the property in question, but had made no formal appraisal or detailed investigation thereof prior to the storm of August 18, 1955. He testified, however, that from his general knowledge he was of the opinion *197 that the fair market value of the property prior to the storm was $125,000. He further testified that he visited the petitioner's premises two or three days after the storm of August 18, and walked around the property as much as was possible, but did not go into the house. He did not at that time make an appraisal of the property, but from his memory of the conditions which he saw he testified that in his opinion the value of the property immediately after the storm of August 18 was $65,000. He further testified that immediately before the storm of October 15, 1955, the value of the property was $85,000, arrived at by adding to his prior valuation of $65,000 the amount of $20,000 which had been expended on the property between the time of the first storm and the second storm. He further testified that in his opinion the value of the property immediately after the October 15th storm was $80,000. He arrived at this figure by subtracting from the $85,000 an amount of $5,000, which he concluded it would have been necessary to spend to remove the silt and the delta deposited by the storm of October 15, based on his assumption that that was the amount which had been expended for that purpose *198 after the storm of August 18, 1955. The respondent presented as a witness Eldred Tanner, who had been a member of the board of town assessors of the town of Warren, Connecticut, for 20 years and who had been its chairman for 8 or 9 years. He had engaged in the appraisal of properties for taxation purposes during this time, stating that he and other members of the board appraised about 25 to 35 properties per year. He was familiar with the petitioner's property just prior to and just after the 1955 storms. He visited the petitioner's property a few days after the August 18 storm, but did not go inside the house. It was not until the early part of November 1955 that he went into the house. He testified that in his opinion the fair market value of the property before the storm of August 18 was $75,000, and that its fair market value immediately after the storm was about $55,000. However, he also testified that for local tax purposes the town assessors, of which he was chairman, had assessed the property in 1954 at a valuation of $24,490 and that this assessment was on the basis of 25 percent of the fair market value. Thus the fair market value in 1954, as determined by the town assessors, *199 was approximately $97,960. He also testified that for 1955, as a result of an appraisal made in November 1955, the property was assessed for local tax purposes at a valuation of $21,896.86. This would indicate that the town assessors had determined the fair market value to be about $86,600. The petitioner also presented proof of expenditures made after the storms in attempting to restore the property to its prior condition. He showed expenditures of $37,515.22 for labor, materials, and equipment. We have heretofore accepted as evidence of loss of value of damaged property the cost of necessary repairs which did not increase the value of the property beyond its value prior to the casualty. See W. F. Harmon, supra.On the other hand, the cost of replacement of property or equipment may not reflect the value of the property which was replaced. Here some of the expenditures, the precise amount of which cannot be accurately found from the record, were for replacement of property or equipment which had been installed in the house at the time it was built in 1933. Accordingly, we think that the amount expended is in itself not here an accurate reflection of the loss in value *200 of the property, although we have taken it into consideration, along with other evidence, in arriving at our findings as to the value of the property before and after the two storms. We have also taken into consideration the petitioner's testimony that many of the repairs made did not restore the property to its condition before the flood. Based upon a consideration of all the evidence presented, including the opinion evidence presented by the witnesses for each party, we have exercised our best judgment and have found as a fact that the fair market value of the property immediately prior to the storm of August 18, 1955, was $100,000, and that its value immediately after such storm was $65,000. Accordingly, we hold that as a result of such storm the petitioner sustained a casualty loss in the amount of $35,000. After the storm of August 18, 1955, and prior to the time of the second storm, October 15, 1955, the petitioner had expended an amount of approximately $20,000 for repairs and replacements. We think it reasonable to conclude that the value of the property was enhanced to the extent of these expenditures, and have accordingly found that the fair market value of the property *201 immediately prior to the storm of October 15, 1955, was $85,000. The only damage done by the storm of October 15, 1955, was to deposit silt in the stream and rebuild the delta in the lake to approximately the size of the prior delta. We think that the decrease in value of the property due to the second storm may be measured with reasonable accuracy by the amount that [it] would be necessary to expend to clear the stream and remove the delta. The evidence shows that the cost incurred in dredging the stream and removing the delta immediately after the first storm was about $3,700. (In this connection it may be pointed out that [of] the remainder of the amount of $4,804.15 paid by the petitioner to the dredging company, $1,041.75, was paid for services rendered after the second storm and was apparently paid as a result of damage done by such second storm, although not to remove the delta formed by the second storm.) We have accordingly found as a fact that the value of the property immediately after the second storm was $81,300 and that the loss sustained by the petitioner as a result of the second storm was $3,700. Decision will be entered under Rule 50.